

# United States Bankruptcy Court
# for the District of Oregon

**Thomas M. Renn, Judge**
Jonni Paulsen, Judicial Assistant
Andrea Breinholt, Law Clerk

405 East Eighth Avenue, Suite 2600
Eugene, Oregon 97401

(541) 431-4050
FAX: (541) 431-4047

September 21, 2020

\*\*VIA ECF ONLY\*\*

Mr. Keith Y. Boyd
Attorney at Law
724 S Central Ave #106
Medford, OR 97501

Mr. Loren S. Scott
The Scott Law Group
POB 70422
Springfield, OR 97475

Counsel:

This matter came before the court on Reorganized Debtor's (Ameriflex) objection to proof of claim #25-2 filed by Pacific Diamond & Precious Metals, Inc. (PDPM). Having considered the evidence, the parties' arguments, and the supplemental filings, as well as having conducted my own research, I am ready to rule. For the reasons outlined below, I will enter an order disallowing PDPM's claim in full.

Facts

Prior to trial, the parties filed Stipulated Facts re: Objection to Claim 25 (Doc. #796; filed 2/5/20). The parties are familiar with these facts, and I will not recite them. I adopt and find as fact all the parties' stipulations, except that contained in paragraph 24 regarding the $681,936.00 loan balance, which I will discuss in detail below. Additionally, I take judicial notice of the Final Award entered February 15, 2017, by the Arbitration Panel of Portland, resolving several claims between Michael Zoller, Ameriflex, and Phil Cam. *See* Proof of Claim #8-1 filed by Mr. Zoller. The Final Award has been relevant in various matters in this case and, in prior proceedings, the parties have not disputed that the copy of the Final Award attached to Claim #8-1 is an accurate copy and that it says what it says.

The record in this case also reflects that on December 24, 2018, I confirmed the Third Amended Creditor's Plan of Reorganization dated November 13, 2018 (Doc. #472; filed 11/13/18) (Confirmed Plan). *See* Order Confirming Plan (Doc. #529). Mr. Zoller was the proponent of the Confirmed Plan and is the current President of Ameriflex, consistent with the related Agreement for Sale and Purchase of Business Assets (APA) (Exhibit 1 of Doc. #472).

Bases for Objection

In its objection, Ameriflex raises the following bases for disallowance of the claim: (1) the loans made by PDPM to Ameriflex were not authorized or subsequently ratified; (2) the balance due to PDPM cannot be accurately ascertained because of the poor state of the records; (3) any loans by PDPM should be recharacterized as capital contributions; (4) amounts owed by PDPM to Ameriflex should be set off against any amounts owed by Ameriflex to PDPM; and (5) PDPM's claim should not include attorneys' fees or costs. PDPM, for its part, disputes each of Ameriflex's arguments and asserts that Ameriflex lacks Article III standing to pursue the claim objection. I will address each of the issues in turn.

Burden of Proof

A claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a).[1] A properly filed proof of claim "constitute[s] prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). If a party objects, the court must disallow the claim to the extent that it is "unenforceable against the debtor . . . under any agreement or applicable law." § 502(b)(1). "To defeat the claim, the objector must come forward with sufficient evidence and show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." *Lundell v. Anchor Const. Specialists, Inc. (In re Lundell)*, 223 F.3d 1035, 1039 (9th Cir. 2000) (citation omitted). "[T]he objector must produce evidence *which, if believed*, would refute at least one of the allegations that is essential to the claim's legal sufficiency. *Id*. at 1040 (emphasis in original). "If the objector produces such evidence to negate one or more of the sworn facts of the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. The ultimate burden of persuasion remains at all times upon the claimant." *Id*.

Authorization

The parties agree that Oregon law and the Ameriflex Operating Agreement (OA) signed January 17, 2011, (Exhibit 49) govern the question of whether Ameriflex authorized the loan from PDPM. ORS 63.130 outlines the rights of members of LLCs and specifies the consent required for various transactions. More specifically, it states:

> (4) *Unless otherwise provided in the articles of organization or any operating agreement*, the following matters of a member-managed or manager-managed limited liability company require the consent of a majority of the members:
> . . . .
> (h) A transaction involving an actual or potential conflict of interest between a member or a manager and the limited liability company…

ORS 63.130(4) (emphasis added).

---

[1] Unless otherwise indicated, all statutory references are to Title 11 of the United States Code (Bankruptcy Code).

ORS 63.155, on the other hand, outlines the duties of members and standards of conduct. It provides in relevant part:

> (2) A member's *duty of loyalty* to a member-managed limited liability company and its other members includes the following:
>
> . . .
>
>> (b) *Except as provided in subsections (5) and (6) of this section*, to refrain from dealing with the limited liability company in a manner adverse to the limited liability company and to refrain from representing a person with an interest adverse to the limited liability company, in the conduct or winding up of the limited liability company's business;
>
> . . . .
>
> (5) A member of a member-managed limited liability company *does not violate a duty or obligation* under this chapter or under any operating agreement of the limited liability company merely because the member's conduct furthers the member's own interest.
> (6) A member of a member-managed limited liability company may lend money to or transact other business with the limited liability company, provided that any loan or transaction between the member and the limited liability company must be:
>> (a) Fair to the limited liability company;
>> (b) Authorized by an operating agreement; *or*
>> (c) Authorized or ratified by a majority of the disinterested members or by a number or percentage of members specified in the operating agreement after full disclosure of all material facts.

ORS 63.155 (emphasis added).

PDPM argues that the debt to PDPM is enforceable under Oregon law by operation of ORS 63.155(6), because: the loan terms were fair and allowed Ameriflex to continue operating; the OA requires only 66% member approval, which PDPM and Cajon, Inc., provided; and Mr. Zoller ratified the loan because he knew about the loan and did not demand that Ameriflex return the funds.

PDPM, however, reads subsection (6) out of context. Section 63.155, entitled "Duties of members; standards of conduct," addresses the duties of loyalty and care owed by members in a member-managed LLC. Subsection (2) outlines the parameters of the duty of loyalty and provides in subparagraph (b), "*Except as provided in subsections (5) and (6)*, [the member must] refrain from dealing with the [LLC] in a manner adverse to the [LLC] . . ." (emphasis added). Subsections (5) and (6), in turn, specify circumstances in which the member does not violate a duty or obligation. Because the legislature housed subsection (6) in the "Duties of members" section and provided it as a caveat to subsection (2) regarding the scope of the duty of loyalty, subsection (6) is relevant only to the extent that there is a dispute about whether a member breached the duty of loyalty (or other obligation) in lending money to the LLC. That is not an

issue in this matter,[2] nor does it further the analysis of whether Ameriflex authorized the loan from PDPM.

Citing *Synectic Ventures I, LLC v. EVI Corp.*, 353 Or. 62 (2012), PDPM argues that "a self-interested transaction can be approved so long as it is fair [under 63.155(6)(a)], without meeting any other requirements under the statute."[3] PDPM, however, ignores ORS 63.130 and overlooks the Oregon Supreme Court's careful distinction in *Synectic Ventures* between breach of the duty of loyalty under 63.155(6)(a) and the question of whether a particular transaction is authorized under ORS 63.130. *Id.* at 73-81 (analyzing whether the LLC manager breached his duty of loyalty under ORS 63.155 and, if so, whether that deprived him of authority to approve a self-interested transaction under the operating agreement and ORS 63.130). The court recognized "the default rule that transactions involving a conflict of interest by the manager must be approved by a majority of members," pursuant to ORS 63.130(4)(h), which in turn defers to the operating agreement. *Id.* at 79.

ORS 63.130, entitled "Rights of members and managers; consent required," outlines the scope of authority of member-managed and manager-managed LLCs. Subsection (4) defines circumstances in which the consent of a majority of the members is required, but states that the LLC operating agreement might impose a different or heightened consent requirement ("Unless otherwise provided in . . . any operating agreement"). The consistent theme throughout ORS 63.130 regarding consent and approval is that the operating agreement governs the scope of authority held by a member-manager and the extent of the consent required for various transactions. As such, ORS 63.130(4) and, by extension, the Ameriflex OA govern whether Ameriflex authorized the loan from PDPM.

ORS 63.130(4)(h) provides that, unless the operating agreement provides otherwise, a majority of the members must consent to "a transaction involving an actual or a potential conflict of interest between a member or a manager of the limited liability company." Mirroring this statutory language, section 5.3.5 of the OA requires written consent of members owning 66% of the membership interests "to authorize a transaction involving an actual or potential conflict of interest between a Member and the Company." Section 5.7, on the other hand, provides in relevant part: "[a] member may lend money or transact other business with the Company, and, in this case, the rights and obligations of the Member will be the same as those of a person who is not a Member, *so long as the loan or other transaction has been approved or ratified by all of the Members*." (emphasis added). Stated another way, a member may lend money to the company on the condition that the loan is approved or ratified by all members.[4] The parties do not dispute that PDPM had an actual conflict of interest where it was both a member of Ameriflex and the lender. The question is whether the 66% approval provided by PDPM and

---

[2] Ameriflex does not argue that member PDPM breached its duty of loyalty by approving a loan from itself to Ameriflex. Further, ORS 63.155(10)(a)(B) states that an LLC's operating agreement may not eliminate the duty of loyalty, but it may specify the number or percentage of members that may authorize or ratify a specific transaction that would otherwise violate the duty of loyalty. The Ameriflex OA includes sections 5.3.5 and 5.7, discussed below.
[3] PDPM Response Brief re: Trial on Objection to Claim, pg. 2.
[4] PDPM argues that, because section 5.7 does not say that a member may *not* lend money to the company absent the approval of all members, the 66% standard of section 5.3.5 applies. This interpretation would render section 5.7 superfluous and is unconvincing.

Cajon, Inc., through Phil Cam and Brian Cam, satisfies the OA absent the approval of Mr. Zoller and River Hawk Boats, Inc.

Sections 5.3.5 and 5.7 both pertain to conflicts of interest. Although they appear inconsistent as to the extent of required approval, the Oregon Supreme Court provides the following guidance: "when a broad general clause and a limited specific clause are inconsistent, the latter should generally be held to operate as a modification." *Associated Or. Veterans v. Dep't of Veterans' Affairs,* 300 Or. 441, 449 (1985). In this case, the "to authorize a transaction" language in section 5.3.5 is broader than the "lend money or transact other business" language in section 5.7. There may be instances where an Ameriflex member engages in "a transaction" with Ameriflex that does not fit within the "lend money or transact other business" parameters of section 5.7, thus requiring only 66% of member approval. But otherwise, and in this instance where member PDPM lent money to Ameriflex – the precise situation contemplated in section 5.7, the OA requires approval or ratification of all the members. As such, because the Cams acted on their own and without Mr. Zoller's approval, Ameriflex did not authorize the loan from PDPM.[5] I turn next to the question of whether Mr. Zoller and, by extension, Ameriflex subsequently ratified the loan.

Ratification

Chapter 63 of the Oregon Revised Statutes does not provide a standard for ratifying defective LLC actions. Ameriflex argues that ORS 60.273-282, which outlines the requirements for ratifying defective corporate actions, also applies to LLCs pursuant to ORS 63.002. I disagree. ORS 63.002(2) provides: "[w]herever a section of Oregon Revised Statutes applies to *both* 'partners' *and* 'directors,' the section shall also apply: . . . (b) [i]n a limited liability company without managers, to the members of the limited liability company." (emphasis added). Subsection (3) states: "[w]herever a section of Oregon Revised Statutes applies to *both* 'partners' *and* 'shareholders,' the section shall also apply to the members of a limited liability company." ORS 63.002(3) (emphasis added). If the would-be applicable section does not apply to both, it does not extend to LLCs. *See Cortez v. Nacco Material Handling Group, Inc.*, 356 Or. 254, 279 (2014). In this case, while the ratification provisions under ORS 60.273-282 apply to "directors" and "shareholders," the legislature did not include any reference to "partners." Therefore, the standards outlined ORS 60.273-282 do not apply to LLCs or Ameriflex in this case.

Both parties agree, as do I, that *Synectic Ventures* provides guidance on the issue of ratification. The court instructs:

> [I]f purported principal is told of actions of purported agent *under circumstances which reasonably justify an inference of consent* unless the principal discloses his dissent, the failure of the principal to dissent within a reasonable time is, *unless explained*, sufficient evidence of affirmance[.]

*Synectic Ventures*, 353 Or. at 82 (emphases added; citation omitted).

---

[5] Because I resolved the issue of authorization by application of ORS 63.130(4)(h) and OA section 5.7, I need not address the separate question about whether the loan was incurred "other than in the ordinary course of business" under ORS 63.130(4)(g) and OA section 5.3.4.

PDPM asserts that Phil Cam and Brian Cam, on behalf of PDPM and Cajon, Inc., approved Ameriflex's loan from PDPM at a members meeting held on November 15, 2013 (see Exhibit H, page 19 of 21). The parties agree that Mr. Zoller was not present at the meeting. Although Mr. Phil Cam testified that notice of member meetings was usually sent to members by email, along with a copy of the agenda, PDPM did not offer at trial copies of any emails related to the November 15, 2013, meeting or provide other evidence showing that Mr. Zoller received notice of the meeting or a copy of the minutes. Mr. Cam testified that he discussed the PDPM loan with Mr. Zoller and asserts that the latter approved the transaction. PDPM, however, provides no additional evidence to support this assertion, nor did Mr. Cam specify when his conversation with Mr. Zoller occurred or give any clarifying details. In its closing argument PDPM argued that, because Mr. Zoller knew Ameriflex needed a loan and the business continued to operate, he must have known Ameriflex obtained a loan from PDPM and, therefore, consented by remaining silent.

Mr. Zoller testified that he did not learn about debt to PDPM or the $650,000 note dated October 24, 2013, (Exhibit 10) until November or December 2015, long after he was expelled from Ameriflex. He testified that he did not learn about the $750,000 note dated March 1, 2013, (Exhibit 11) until after Ameriflex filed for bankruptcy relief in 2017.

Ultimately, the ratification issue turns on the credibility of Mr. Phil Cam and Mr. Zoller. During the pendency of this bankruptcy case, I have had the opportunity to see them testify on numerous occasions regarding the formation of Ameriflex, its operation, the deterioration of the members' working relationship, the circumstances surrounding Mr. Zoller's expulsion, the subsequent arbitration proceeding, and the parties' exchanges leading up to Ameriflex's bankruptcy filing. I am familiar with the substantial history in this case and the legal positions that Mr. Zoller and Mr. Cam (through his numerous entities) have taken with respect to each other. I am also aware of the considerable procedural lengths Mr. Cam has taken to prevent Mr. Zoller from receiving any payment on his claim #8. Further, in considering Mr. Cam's veracity when he says he discussed the PDPM loan with Mr. Zoller in 2013, I must acknowledge the arbitrator's findings in the Arbitration Award[6] regarding Phil and Brian Cam's actions in relation to the Antelope Road property. In ruling that the Cams engaged in oppressive conduct toward Mr. Zoller, the arbitrator found in relevant part:

> 6. In 2011, Ameriflex members began looking for a new facility due to limitations of its existing 12,000 square foot facility on Brian Way.
> 7. In early 2012, Ameriflex moved its manufacturing operations to a 120,238 square foot facility on Antelope Road in White City.
> 8. Bill Leever approached Phil Cam about the availability of suitable property on Antelope Road. *The Cam brothers did not inform Zoller of their dealings with Leever or of the subsequent purchase of the Antelope property.*

---

[6] As I previously ruled in the context of the related adversary proceeding (Adv. Proc. #17-6024), the Arbitration Award is a final, nonappealable award and is binding on the parties. *See Ameriflex Engineering LLC v. Zoller*, 587 B.R. 108, 113 (Bankr. D. Or. 2018).

> 9. Phil Cam and Brian Cam individually agreed to form a separate company named CamCo, LLC for the purpose of purchasing the property at the new location. After the purchase, Camco leased the property to Ameriflex. Ameriflex began leasing the property in December 2011. []
> 10. *Zoller and Ameriflex were not invited to participate in the purchase of the Antelope Road property.*
> 11. Before and after the business moved to the Antelope property, Ameriflex spent substantial company funds for improvements to this property.
> 12. In April/May of 2012, Zoller first learned that the Cam brothers had purchased the property, not Ameriflex, and that *a long-term lease had been entered into between Camco and Ameriflex without Zoller's knowledge. Zoller's discovery of this arrangement created a significant conflict between Zoller and the other members.*

Arbitration Award, at *2 (part of Claim #8-1) (emphasis added). While the oppressive conduct determination has no bearing on this matter, the arbitrator's findings regarding the Cams' failure to inform Mr. Zoller about the purchase of the property and the long-term lease tend to support Ameriflex's argument that Mr. Cam also did not inform Mr. Zoller of the PDPM loan.

In this matter, there are numerous inconsistencies between Mr. Phil Cam's testimony and the other evidence in the case. The inconsistencies span a wide range of issues, including the Ameriflex meeting minutes (discussed in more detail below) and the status of the Rogue Federal Credit Union line of credit, which Mr. Cam asserts formed the basis for Ameriflex needing to borrow funds from PDPM. I note that, where the testimony and evidence differ, the testimony – almost without exception – works in favor of Mr. Cam, one of his entities, or both. Although PDPM offered explanations for the inconsistencies, most of the explanations are supported only by the testimony of Mr. Cam.

For the above reasons, I do not find Mr. Cam's testimony credible. As such, I do not accept his assertion that he discussed the PDPM loan with Mr. Zoller in 2013 or that Mr. Zoller approved the loan during that conversation. Based on Mr. Zoller's testimony that he did not learn about the loan until 2015, after he was expelled from Ameriflex, I find that he did not ratify the loan. PDPM's argument that Mr. Zoller must have known about and consented to the loan because Ameriflex continued to operate without dissent from Mr. Zoller is a far cry from the "circumstances which reasonably justify an inference of consent" standard outlined in *Synectic Ventures*. His failure to dissent is explained by the fact that he did not know about the loan because the other members did not invite him to the meeting where they discussed it and did not tell him about it afterward. Therefore, where Mr. Zoller did not ratify the loan, all the members did not approve or ratify the loan from PDPM, as required under section 5.7 of the OA.

Post-Expulsion Extensions of Credit

PDPM argues that, even if the loan was not authorized or ratified under the OA prior to Mr. Zoller's expulsion from Ameriflex on March 31, 2014, the current debt balance is based on advances made from PDPM after his expulsion. Again, it points to Exhibit 11 (the March note)

and the November 15, 2013, meeting minutes to support the claim. The March note outlines the terms for a $750,000 loan from PDPM to Ameriflex at a rate of 6% per annum. It does not specify a monthly payment amount, but instead states that it "will be repaid in amounts as determined on a monthly basis." The note is dated March 1, 2013, and is signed by Phil Cam and Brian Cam, as President and Forman [sic] of Ameriflex, respectively. Curiously, the note identifies the borrower as "Ameriflex Engineering LLC, Dba RH Boats," yet RH Boats was not registered as an assumed business name until December 5, 2014 (Exhibit 15). Even so, the November 15, 2013, meeting minutes purport to approve a loan from PDPM to Ameriflex for "up to $600,000 with amount to be adjusted at the time of need for funding with a compound interest rate of 6%." The minutes provide: "[a] Promissory Note dated 11/15/13 and signed by 66% of the members will become effective."

Mr. Phil Cam testified that Ameriflex signed and executed the March note on or around March 1, 2013. He represented that he and Mr. Brian Cam executed a second note for $650,000, dated October 24, 2013 (the October note), on or around that date, believing the March note to have been lost. He said they should have, but didn't, cancel the October note when they located the March note. But more important for our purposes, neither note – which PDPM says existed at the time of the November 15, 2013, meeting – reflect the November 15, 2013, note date referenced in the meeting meetings. Further, the Cams' approval of $600,000 "total aggregate" debt does not match either the $750,000 figure in the March note or the $650,000 amount in the October note. At best, the minutes suggest the existence of a third note not in evidence.

But there are other problems with the November 15, 2013, meeting minutes. Mr. Phil Cam testified that the members' process for taking minutes was "informal" and usually involved one of the members taking notes and then emailing the notes to the other members after the meeting. Indeed, all but one of the 19 sets of meeting minutes in Exhibit H appear to fit this description. They are brief, informal, and usually consist solely of a bulleted list. When these minutes are incorporated into the body of an email, the email itself is only ever generated by and sent to Mr. Zoller, Mr. Phil Cam, and Mr. Brian Cam.

The November 15, 2013, minutes are out of character from all the others. They include a formal header, contain named various sections, and list the attendees and the entities they represent. They include formalized language that is absent from the other minutes, and they outline, to the minute, when the meeting "was called to order" and "adjourned." Given the level of detail and formality in the November 15, 2013, minutes, it seems highly unusual that they would include such stark errors as an incorrect note date and loan amount, especially where the PDPM loan appears to have been the primary agenda item. Additionally, the minutes indicate that they were prepared and "submitted by" Lisa Case, Office Manager, for Phil Cam's approval. Yet there is no evidence to suggest that Ms. Case (or any staff) attended or prepared minutes for any other member meeting. Ms. Case did not testify at the hearing nor did Mr. Brian Cam, the only other person who attended the meeting. To support the authenticity of the minutes, PDPM offers only the testimony and credibility of Mr. Phil Cam, which I've already discussed.

For the above reasons, I find that the November 15, 2013, meeting minutes, at best, pertain to a third promissory note not in evidence or, as seems more likely, they were altered and/or generated for purposes of litigation. Either way, I reject them as evidence of the LLC's approval of the March note on which PDPM bases its claim. Therefore, absent LLC approval of the loan, PDPM does not have an enforceable contract. That leaves only PDPM's argument that

it should be repaid for the amounts advanced to Ameriflex after Mr. Zoller's expulsion on March 31, 2014.

The $681,936.03 total balance indicated on Exhibit 17 reflects advances made to Ameriflex and Ameriflex's payments since May 31, 2013.[7] I do not, however, see evidence in the record to support the argument that the post-expulsion advances support the $681,936.03 claim, after accounting for Ameriflex's payments to PDPM. If we exclude the four advances totaling $700,000 made between May 31, 2013, and January 31, 2014 (those prior to Mr. Zoller's expulsion), the bottom line is negative, and PDPM does not have a claim. This assumes, however, that the $200,000 payment to PDPM on March 31, 2014, should be treated as a post-expulsion payment. PDPM did not offer evidence regarding the timing of the payment, leaving open the question of how I should account for it in the total balance. Further, although Ameriflex made numerous interest expense payments to PDPM, PDPM was unable to provide an accounting of how interest accrued or how it applied payments to interest, principal, late fees, etc. Given the wide variability of the payment amounts (between $27,000 and $320,000) and the fact that Ameriflex skipped payments for months at a time, I cannot reconcile the payments to the terms of any agreement between the parties.

Additionally, Exhibit 17 lists a $470,012.02 advance made on December 1, 2014, from account 1503, designated "P Cam." PDPM witness Ms. Gleitsman testified that account 1503 pertains to loans owed by Ameriflex to Mr. Phil Cam, individually. She did not explain why an advance from Mr. Cam's 1503 account is included in the balance for money owed to PDPM. The QuickReports for account 1503 (Exhibits 20 through 22) show advances and repayments from/to Phil Cam going back to January 1, 2011, long before the purported loan from PDPM arose in 2013. The entry on Exhibit 22 for December 1, 2014, shows where Mr. Cam zeroed out the then-balance of $470,012.02 and transferred it to PDPM account 2821, consistent with the corresponding entry on Exhibit 17. Yet PDPM did not address this issue of comingling the Phil Cam (1503) and PDPM (2821) accounts. Nor did it provide evidence establishing PDPM's right to assert a claim on behalf of Mr. Cam. If we remove the $470,012.02 amount from Exhibit 17, the post-expulsion balance is negative.

For these reasons, I find that the amount owed to PDPM is $0. Alternatively, based on the poor state of the records, PDPM has not met its burden to prove the validity of the claim or its amount.

Additional claims asserted by PDPM

In its post-trial supplemental brief, PDPM raised three new bases for recovery against Ameriflex: unjust enrichment, money had and received, and restitution. PDPM seems to have overlooked that I invited supplemental briefing on only certain defined issues. PDPM exceeded the scope of what I authorized and attempts to retroactively attach new claims onto evidence presented at trial. PDPM did not list these equitable claims in either version of its proof of claim. Nor did it bring an adversary proceeding against Ameriflex, as required under Fed. R. Bankr. P. 7001, to obtain a money judgment on these grounds. Where Ameriflex filed its claim objection in January 2019, PDPM had ample opportunity to timely assert the additional claims. To do so in

---

[7] For purposes of this ruling, I do not consider the nominal advance of $1,939.05 on December 31, 2010, and Ameriflex's payment of $1,939.05 on January 31, 2011.

this manner is inappropriate. Given that PDPM seems to have raised the equitable claims as defenses to Ameriflex's claim objection, I conclude that it waived the defenses by failing to timely assert them.

Standing

In its closing argument, PDPM raised for the first time the issue of whether Ameriflex has standing to object to PDPM's claim. The parties made their arguments and stated on the record that they are satisfied they've addressed the issue.

The Ninth Circuit instructs:

> To have standing in bankruptcy court, [a party] must meet three requirements: (1) they must meet the statutory "party in interest" requirements under § 1109(b) of the bankruptcy code; (2) they must satisfy Article III constitutional requirements; and (3) they must meet federal court prudential standing requirements.

*In re Thorpe Insulation Co.*, 677 F.3d 869 (9th Cir. 2012). Taking each requirement in turn, section 1109(b) states:

> A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may be heard on any issue in a case under this chapter.

"The 'party in interest' standard has generally been construed broadly." *Id*. at 884. "Courts must determine on a case by case basis whether the prospective party has a sufficient stake in the proceedings so as to require representation." *Id*. Regarding Article III standing, "the party seeking standing must demonstrate an injury in fact that is traceable to the challenged action and that is likely to be redressed by a favorable decision." *Id*. at 887. In the chapter 11 context, the participant must "hold[] a financial stake in the outcome of the proceeding such that the participant has an appropriate incentive to participate in an adversarial form to protect his or her interests." *Id*. Finally, with regard to prudential standing, "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Id*. at 888.

PDPM does not assert that Ameriflex lacks prudential standing or is not a party in interest. Instead, it focuses on Article III, arguing that Ameriflex lacks standing because BlueEarth Marine, LLC – not Ameriflex – would be obligated to pay PDPM's claim, if allowed. But this is an overly simplistic view of a complex situation.

Ameriflex has Article III standing for several reasons. First, as the entity for which PDPM purported to authorize loans from itself without proper authorization or member approval, Ameriflex suffered the injury in fact. Second, as the Reorganized Debtor subject to the Confirmed Plan and the related APA, Ameriflex is legally obligated to pursue the claim objection. Article 6.2 of the Confirmed Plan provides:

> Reorganized Debtor *shall investigate and, where appropriate, assert objections to Claims* and/or causes of action against Creditors, Claims, or Equity Security Holders. All pre-petition and post-petition causes of action held by the Debtor, and all Chapter 5 avoidance claims, shall be held by and may be pursued by Reorganized Debtor. To the extent any recoveries are received, they will be used to offset or reduce the payment obligations of BlueEarth on those Claims as otherwise set forth in the Asset Purchase Agreement and this Plan. *Any affirmative recovery beyond offset or claim reduction shall be retained by Reorganized Debtor.*

(emphases added). Section 1.4 of the APA states:

> **Claim Objections**. The Reorganized Debtor and [BlueEarth] will jointly have the right to assert all of Seller's rights, claims, causes of action, affirmative defenses, and other theories of relief of any kind whatsoever. . . . [BlueEarth] will retain the benefit of any claim reductions or offsets, but Reorganized Debtor will have the right to receive any affirmative recovery under such claims to the extent they exceed the Assumed Liabilities.

BlueEarth's and Ameriflex's agreement to delegate to Ameriflex the obligation to object to claims is simply one facet of the APA and was presumably considered by Ameriflex and BlueEarth when they set the total purchase price of Ameriflex's assets. Compared to BlueEarth, Mr. Zoller's intimate knowledge of the facts at issue make him, as president of the Reorganized Debtor, a far more logical choice to pursue the claim objections. The array of post-confirmation litigation has demonstrated Mr. Zoller's and Ameriflex's dedication to participating in an adversarial form to protect Ameriflex's interests. Further, if Ameriflex declined to pursue the objection, it would arguably be in default under the Confirmed Plan and potentially subject to a breach of contract claim by BlueEarth. Finally, where Ameriflex seeks not only to disallow PDPM's claim, but asserts additional claims for setoff, Ameriflex would benefit from any affirmative recovery. Thus, Ameriflex has Article III standing. These factors also satisfy the party in interest and prudential standing requirements.

Other Issues

As noted above, Ameriflex outlined in its objection numerous grounds for disallowing the claim. Where Ameriflex did not authorize the loan from PDPM and there is no money owing, the issue regarding recharacterizing the debt as a capital contribution is moot. Similarly, Ameriflex's setoff arguments are also moot, as there is no debt from which to set off. If Ameriflex wishes to obtain a judgment on its claims regarding the fisheries grant money or the alleged excessive payments, etc., to PDPM, it must assert the claims in an adversary proceeding. Finally, as PDPM's claim will be disallowed, it is not entitled to receive payment for its attorneys' fees.

Conclusion

    Although PDPM, in filing its claim, made a prima facie showing of indebtedness, Ameriflex provided substantial evidence to demonstrate that the loan agreement is not enforceable. For the reasons outlined above, Ameriflex did not authorize the loan from PDPM, because Mr. Zoller did not give his approval as required under ORS 63.130 and section 5.7 of the OA. Phil Cam and Brian Cam did not inform Mr. Zoller of the loan from PDPM, and, where he did not learn about it until after his expulsion from Ameriflex, he did not ratify the loan. The credible evidence does not support the conclusion that Ameriflex approved either the March note or the October note. Further, the post-expulsion advances from PDPM are less than Ameriflex's payments to PDPM during that same time period, bringing PDPM's claim to zero. Alternatively, based on the poor quality of the records and comingling with the account for Mr. Phil Cam, PDPM has not met its burden to prove the validity of the claim or its amount. As such, I will enter a separate order disallowing PDPM's claim in full.

                                                    Very truly yours,

                                                    THOMAS M. RENN
                                                    Bankruptcy Judge

TMR:jrp